JAMES KIRKSEY, APPELLANT, *vs.* THE FLORIDA AND GEORGIA PLANK-ROAD COMPANY, APPELLEE.

Where in an Act incorporating a Plank-Road Company, there is an omission to designate and limit the amount of the capital stock, and also an omission to prescribe the value of the shares, such omission does not invalidate the Act, and all that is required of the Company for a full enjoyment and exercise of the granted franchise is, that it shall limit its operations to the consummation of the object contemplated by the Act.

A corporation can maintain an action upon an implied promise, for the collection of assessments made on the shares of stock owned by a corporator, notwithstanding the charter may provide for the forfeiture or sale of the shares of delinquents.

Where by the terms of the subscription a penalty is prescribed variant from that designated in the charter of incorporation, such penalty will be viewed either as surplusage, or as accumulative, and will not be interpreted into a condition for the benefit of the subscriber.

The case of Barbee vs. The Alligator and Jacksonville Plank-Road Company referred to and approved.

Appeal from a judgment of Leon Circuit Court.   This was an action of assumpsit instituted by the appellee, against the appellant, to recover the balance due upon a subscription by the appellant, to the capital stock of said Plank-Road Company.   The declaration contains only one count in which the subscription of the defendant in the Court below, amounting to two thousand dollars, is alleged, and also that the said defendant had been duly required to pay his said subscription in pursuance of the Act of incorpora-

tion of said Company. Attached to the declaration is the following bill of particulars:

James Kirksey to Tallahassee Branch of the
1584.                   Florida and Georgia Plank-Road Co.,
April 22.—To amount of Stock Subscription,      $2,000 00
July    3.—Payment of 1st instalment of 10 pr. ct.,    200 00
                                                        _____

                   To bal. due on average, 20th Mar., '55, 1,800 00

To this declaration the plea of non assumpsit only was put in.

The plaintiff in the Court below offered in evidence the following subscription paper, signed by the defendant, viz:

"We the subscribers bind ourselves hereby to take the amounts opposite our names in the stock of the branch of the Florida and Georgia Plank-Road Company to run from some point at or about Tompkins' Mill to Tallahassee, under penalty of forfeiture of half the amount so subscribed by us if we fail or refuse to pay up our instalments of stock as they may be called for."

It was admitted in the Court below as appears by the bill of exceptions, that James Kirksey the defendant and others affixed their signatures to the foregoing.

It was also admitted by the defendant that he paid to the plaintiff two hundred dollars, the first instalment on his stock called in, as set forth in the bill of particulars attached to the declaration.

It was also admitted that the defendant did at one time act as a Director of said Company.

It was also admitted that the Plank-Road mentioned in the subscription paper had been finished by the Company.

*Long & Galbraith* for appellant.

*Archer & Papy* for appellee.

DuPont, J., delivered the opinion of the Court:

This was an action of assumpsit brought in the Circuit

Court of Leon county, by "The Florida & Georgia Plank-Road Company" against the appellant, to recover the amount of a balance alledged to be due upon his subscription to the capital stock of said Company. The declaration contains only the indebitatus count and alledge as special demand; but there is no proof in the record to support this allegation. It may well be doubted whether, in this state of case, the recovery could be sustained, but understanding from the counsel who closed the argument for the appellant, that it was desirable to obtain an adjudication as to the extent of the liability incurred by the appellant upon his subscription to the capital stock of this Company, we consider the objection to this defect of proof, as having been expressly waived, and have examined the case solely with reference to the legal liability of the party.

It may be proper to premise, that the Act incorporating this Company seems to have been very losely drawn and rather variant from the formula usually adopted in similar cases. In this Act the amount of the capital stock is not prescribed, nor is there any limitation to the same. There is no designation of the number of shares into which the capital stock is to be divided, nor is there any provision made for dividing the same, although direct reference is made to such shares. No provision is made for the election of Directors, nor is any mode prescribed for the administration of the affairs of the Company, other than what may be found in the grant of "the usual rights and privileges of such corporations." There is simply a grant of authority to construct a Plank-Road upon a designated route, and the amount of the capital stock and such other limitations and regulations as are usually prescribed in similar charters seem to have been committed to the discretion of the Company. As *unique* as are the provisions of this Act, we cannot doubt its operative character, and that

4

it confers a franchise which may be rightfully exercised. So long as the Company shall limit its operations to the consummation of the object contemplated by the Act of incorporation, we think there can be no doubt of its right to enjoy that franchise.

The terms of the subscription paper which was in evidence on the trial of the cause, and which it was admitted had been duly signed by the defendant, is in the following words: "We the subscribers bind ourselves hereby to take "the amounts opposite our names in the stock of the branch "of the Florida and Georgia Plank-Road, to run from some "point at or about Tompkins' Mill to Tallahassee, under a "penalty of forfeiture of half the amount so subscribed by "us, if we fail or refuse to pay up our instalments of stock "as they may be called for."

Upon this agreement, two points were made and discussed by the counsel for the appellants:

1st. That by the terms of the agreement there was no express promise to pay and that no action can be maintained by the corporation upon an implied promise to pay assessments, where the charter provides the remedy of a forfeiture of the stock.

2nd. That the word "penalty" contained in the body of the agreement is to be construed as a condition whereby the defendant was to be permitted at his discretion to abandon his subscription upon the payment of one moiety of the amount subscribed.

In the case of "Barbee vs. The Jacksonville and Alligator Plank-Road Company," (6 Fla. R. 262.) this Court decided that an action might be maintained for the recovery of assessments where the agreement to subscribe for stock contained an express promise to pay, notwithstanding the Charter provided a further remedy by forfeiture.— The point raised in the case now at bar, viz: the right to

Kirksey *vs.* The Fla. & Ga. P. R. Co.—Opinion of Court.

maintain an action upon implied promise, was expressly reserved for future consideration.

In proceeding to consider the first point above indicated, we waive the enquiry whether or not the terms of the agreement contain an express promise to pay, and proceed at once to meet the objection precisely as it is made.

The Massachusetts decisions cited at the argument, seem very fully to sustain the distinction contended for, but they are met by adjudications in other States; among them the States of North Carolina and Alabama, in the former of which no such distinction is intimated, and in the latter it is expressly repudiated. (Vide Tar River Navigation Co. vs. Neal, 3 Hawks 520 ; Beene vs. The Cahawba and Marion Railroad Co., 3 Ala. R. 660 ; Carlile vs. The Cahawba and Marion Railroad Co., 4 ib. 70 ; Selma and Tennessee R. R. Co. vs. Tipton, 5 ib. 787.)

In the case cited from 3 Ala. R., the only evidence adduced upon the trial to support the assumpsit to pay, was the book of subscription, which was as follows:

" Cahawba, Dallas County, State of Alabama.

" A book of subscriptions to the capital stock of the Ca-"hawba and Marion Railroad, opened on the 20th day of " March, 1837, by order of the Board of Directors assem-"bled in the town of Cahawba on the 13th day of March, "1837, under the direction of James Craig, Richard C. " Crocheron, Joseph Babcock and P. Walter Herbert."

The names were signed thus:

| "Date. | Names. | No. of Shares. | Total Stock. |
|--------|--------|----------------|--------------|
| "March 29. | Jesse Beene, | 20 | 2,000." |

Goldthwait, J., delivering the opinion of the Court remarks: " The act of subscription thus made, is equivalent in every respect to an express contract, and the terms prescribed in the charter attached to it as effectually as if they had been written at length."

He again.says: "The cases cited from Massachusetts admit that a member of a corporation may become bound by an express contract to pay assessments, although an agreement to take shares in an incorporated association will not be construed as such a contract. We are not aware of the terms contained in the statutes under which these decisions were made, but if similar to that we have just considered, we feel constrained to declare the law to be otherwise.—The principles we have laid down as governing this case are sustained by numerous decisions, and we may remark, that none have been found, except those of Massachusetts, which held a different rule."

To our minds the distinction contended for seems to be singularly arbitrary, and is neither deducible from any established principle of law, nor sustained by any sound reason. C. J. Parsons, for whose character as a jurist we entertain the very highest respect, seems to have based the existence of this assumed distinction upon the fact that an express in contradistinction to an implied promise, always imports a legal consideration. He says: "Where this express agreement has been made, we have decided that it may be enforced by action, *there being a legal consideration for the contract.*" 6 Mass. R. 42. Now with all proper deference, we would respectfully inquire what there is in the nature of an implied promise, which negatives the idea of a legal consideration? Indeed every implied promise, presupposes the existence of a sufficient consideration, for it springs only out of a legal liability which never arises but upon a legal consideration as ample as is the extent of the liability. Not so however with respect to an express promise. That may, and not unfrequently is made in the absence of an adequate consideration—the promise is perfect in itself, and is incapable of enforcement only upon the ground of this absence of consideration.

The consideration alluded to by the C. J., in the remark above noted, was evidently the correlative right to enjoy the franchises granted by the act of incorporation and to participate in the benefits which were expected to arise therefrom, and we can conceive of no good reason why the same right of enjoyment and expectancy of benefit might not form the foundation of an implied promise.— The distinction insisted upon involves a refinement which so far from subserving any beneficial purpose, or promoting the attainment of justice, is well calculated to jeopard the rights growing out of a most extensive and important class of contracts.

As enunciated by this Court in the case before alluded to, we repeat that "it is of the highest importance that those who thus associate should be held to the observance of the most perfect good faith ;" and we may pertinently add that the simple act of subscribing to the capital stock creates a mutuality of liability which it would be a fraud upon his associates for a recusant stockholder, at his discretion, to be permitted to escape by the mere abandonment and forfeiture of his shares of stock. If the act of subscribing to the capital stock is to be viewed as creating no legal liability to pay the amount subscribed and as imposing no penalty other than this, it would be eminently illusory and wholly defeat the undertaking and successful prosecution of all enterprises tending to the development of the resources of the country and requiring the aid of associated capital. For it is worthy of note that in all our southern States, capital, so far from seeking investment in enterprises of this character, has to be invested wholly by considerations of patriotism. In Massachusetts and other northern States where the doctrine contended for obtains, there is a superabundance of monied capital which makes it a privilege to be permitted to associate for purposes of public enterprises, while with us every contribution to such a purpose

is looked upon as a direct tax upon individual means.— This striking difference in the condition of the two sections would seem to demand a difference in the application of the law, especially when it may be done without the violation of any fundamental principle, and is moreover sustained by precedents of no lesser weight and respectability.

It will not be pretended that in a contract between natural persons, the obligee may not waive the penalty and proceed for general damages for breach of the agreement.— (Comyn on Con. 473.) There is no good reason why the doctrine may not as well apply to an artificial person, (such as the plaintiff in this suit,) when by the very terms of the charter of incorporation the right to sue is expressly given, and there is no restriction as to the enforcement of the penalty.

The second point raised at the argument involves an interpretation of the terms embraced in the articles of subscription. For the appellant it was insisted that the latter clause of the agreement amounted only to a *condition*, while it was contended on the other side that the agreement was to be interpreted according to the legal and technical import of the words used, viz : as imposing a penalty. To support the former position, great stress was laid upon the fact that viewed as a penalty, this clause of the agreement was variant from the provision contained in the section of the charter which contemplated a forfeiture of the whole amount of the sum to be subscribed by each stockholder. We are unable to appreciate the force of the argument in this connection, but are rather disposed to view this clause of the agreement as wholly nugatory, or at most as only superadding a penalty to the one stipulated in the charter ; and having been voluntarily assumed by the defendant, it does not become him to complain even if it were now sought to inforce it, which however is not the object of this suit. Whatever may have been the real under-

standing of the parties to this agreement, it certainly cannot be expected of us that in the total absence of any evidence tending to vary the obvious and well understood import of the terms used, we should proceed to give it a different interpretation.

Let the judgment of the Circuit Court be affirmed with costs.

BALTZELL, C. J., delivered the following dissenting opinion.

This is a suit instituted by the Plank-Road Company upon a writing in these words : " We the subscribers bind ourselves hereby to take the amount opposite our names in the stock of the branch of the Florida and Georgia Plank-Road to run from some point at or about Tompkins' Mill to Tallahassee, under a *penalty of forfeiture of half the amount subscribed by us if we fail or refuse to pay up our instalments of stock as they may be called for.*"

The difficulty lies in the construction of the closing sentence. It is certainly very obscure and awkwardly expressed, containing technical phrases that obscure and perplex rather than aid in its proper understanding. The agreement is not a simple one to pay money or stock, it is to do one or the other under terms, and with a proviso. There are words qualifying the agreement which may not any more be rejected than new ones may be added. To do either would be to make a new agreement for the parties and not construe that made by them, which is the full extent of the authority of the Court. If the parties designed to subscribe stock or money merely, the close of the agreement was idle and absurd ; there would have been an engagement in these words : "we agree to take the amount of stock opposite our names." It is true they say this, but they say more, that they do it under penalty of forfeiture of one half the amount subscribed.

It is this qualification that gives color and significance· to the agreement, and distinguishes it from a simple agreement. What is the meaning of it? Is it a proviso for the Company? This cannot be, since they had all they desired in the preceding part of the writing; they desired to sell the stock and this party took a portion of it, and they could forfeit the whole for non-payment by the express terms of the charter. It must then have been for the defendants and the entire proviso shows it to have been designed for them. They decline to make an absolute subscription— they consent to subscribe with permission to forfeit half the amount subscribed in case of their failure or refusal to pay the instalments. This is what they bargain for, and it is the only construction that gives them anything. Without this the words are senseless ·and without a meaning. To give judgment for the entire·sum is·to reject the words entirely and construe the instrument as if they had not been inserted. It is true the words penalty and forfeiture have meanings in law which may not bear out this idea, yet if they mean anything here, they mean condition or proviso for penalty, and payment for forfeiture. There is a plain agreement that the whole is not to be paid if the subscribers fail or refuse, but that one half the amount is to be the forfeit. In this connection I desire to cite some rules of construction, throwing light on the subject:

" A liberal construction should be put ˙ upon written instruments, so as to uphold them if possible and carry into effect the intention of the parties. In construing a deed, every part of it must be made if possible to take effect, and every word must be made to operate in some shape or other. In these later times the Judges have gone further than formerly, and have had more consideration . for the substance, to-wit: the passing of the estate according to the intent of the parties, than the shadow, to-wit: the manner of passing it." Broome's legal max. 238.

" In the case of an agreement also the Courts are bound so to construe it *ut res magis valeat quam pereat* so that it may be made to operate rather than be inefficient, and in order to effect this, the words used shall have a reasonable intendment and construction. Words of art for instance. which in the understanding of conveyancers have a peculiar technical meaning, shall not be scanned with a conveyancer's acuteness if by so doing one part of the instrument is made inconsistent with the other and the whole is incongruous and unintelligible, but the Court will understand the words used in their popular sense and will interpret the language of the parties *secundum subjectam materiam* refering particular expressions to the particular subject matter of the agreement, so that full and complete force may be given to the whole." Ibid 241.

" Covenants are to be construed according to the obvious intention of the parties as collected from the whole context of the instrument containing them and according to the reasonable sense of the words, and in conformity with this rule a covenant in large and general terms, has frequently been narrowed and restrained where there has appeared something to connect it with a restrictive covenant or where there are words in the covenant amounting to a qualification." 7 East 241 ; 8 East 89 ; Broome's Legal Max. 250.

There are other reasons why I think this plaintiff is not entitled to recover. " The subscribers bind themselves to take the amounts *opposite their names* in the stock of the Road." Now there is no amount fixed opposite the name of the defenadant in the paper contained in the record, nor does it seem to have been under seal, or to have had other names attached to it, nor is there proof of any amount of stock taken. The declaration alleges a promise to pay money "for shares"—nor proof of the number of shares, nor

of their value, nor of an amount of money engaged to pay. The only approach to anything of the kind is contained in an admission of a payment of two hundred dollars, as a first instalment. How this is to be added to the witten instrument, so as to complete it and supply the deficiency in the amount of shares and of subscription of a definite sum of money and of the value of shares taken so as to form the foundation for a judgment of $2000, I am at a loss to determine. We are told that an implied engagement will answer for these corporations and that an express one is not necessary. It will be found that no court has ventured so far as this, in making and giving judgment by implication. If there were an engagement to take twenty shares of stock, or $2000 in the stock of the Road, the right of recovery even then is by no means clear. The charter has no provision for raising capital, none fixing the rate and value of the shares, nor is there an agreement or deed to ascertain and define either of these, nor is there provision in the charter to enforce payment of shares, except by forfeiture. Can an incorporated company exist or be brought into life and vitality without such provisions. Are there shares without capital, are there instalments without shares of fixed value? Shares are a portion of an ascertained amount of capital —instalments, of shares. Without shares there are no stockholders, for a stockholder is the holder of shares by purchase from a company. What had such a company to sell to make capital but shares. It is supposed that the omission of the charter in not having a provision existing in every other trading company ever incorporated by our own Legislature—by those of the States and of the English Parliament, may be supplied by resorting to the rules of partnership. If so, let it be established—let an authorty be adduced to show it. I find no doctrine of the kind. A case in Alabama is quoted of subscription adjudged to be binding by the Courts of that State. There the party subscribed

a certain number of shares to a corporation established by the Legislature of the State, the amount of capital and value of the shares being expressly fixed by the charter, and these facts distinctly stated in the report of the case.— They were considered important there and elsewhere, or why have they been used and inserted?

That the amount of the capital and value and number of shares are essential in the charter of a company such as this is, I quote the folllowing authorities:

Lord Eldon in speaking of the subject says, if individuals go to Parliament, and Parliament on being satisfied that the railway or canal can be made at an expense, say of £100,000, close with their application and forms them *into a company, with power to raise money to that amount,* that authority is given them by Parliament in the full confidence that the sum which they have asked and obtained power to raise will enable them to execute the work. But if a case arises in which parties have been enabled by Parliament to engage in an undertaking on a representation that £100,000 would enable them to complete it, and if they find afterwards that £100,000 is not enough for that purpose, this Court would I think, find it very difficult to allow them to proceed with the work till they had obtained further authority. (1 Myl. and K. 549.)

" Where a statute declares that A. B. & C., and such other persons as shall hereafter become stockholders of said company are hereby constituted a body corporate and politic, no corporation exists if there be no stock distributed." Crocker vs. Crain, 21 Wend. 211.

" A distribution of stock by commissions not sufficient to constitute a legal board, is void, and any instrument given for the payment of the first instalment of stock subscribed for is void for want of consideration." 21 Wend. 211, 4 Ala. 70.

" Where persons were incorporated with a present capi-

tal of $60,000, when in fact the capital paid in was only $37,000, it was held that the creditors of the corporation might compel the corporators to increase the capital to $60,000 in order to satisfy their demands." 1 Strob. Eq. 209.

"As appears by his certificates of stock, he was the party with whom the company contracted. If he wished to transfer his stock he could have done so. But by the terms and conditions of his certificate of stock which constituted his contract with the company, he could have done so by making a transfer upon the books, &c." 2 Barb. 699.

These authorities abundantly show that shares of stock are the material and essential part of an incorporated company. It is supposed that this defect may be cured by regarding the stockholders as subscribers to a joint concern, and it must be admitted that there is a principle which gives this an apparent sanction. "If matters arise which are not provided for by the statute, resort must be had to the general law of partnership." Woodworth joint stock co., 88.

Yet it is held to be "one of the acts inconsistent with the character and constitution of a trading corporation to institute a suit for a debt against a corporator without being specially empowered by their constituting act to do so, for such a partnership though incorporated, still retains so much of its original character, that without special permission in the act or charter by which they are constituted, they could not sue one of their own body for a debt not being the penalty of a by-law nor due on penal statute to the corporation as the party grieved." Grant on Corporations 283. Dendalk R. Co. vs. Topston 19 B. 667.

The case of Fox vs. Clifton and others, decided by Tindal, C. J., explains the subject of stock companies acting without charter. Early in March 1825, certain persons met together and resolved to form a company to be called

the Imperial Distillery Company, and issued a prospectus proposing a capital of £600,000—12,000 shares, at £50 each. A verdict having been obtained, a new trial was moved for and the Judge expressed himself as follows; we quote a portion only of the opinion, as it is too long to be copied at large : " The main and important question is whether under the circumstances proved at the trial the defendants were actually partners in the Imperial Distillery Company, for if partners, the general principle which governs all partnerships in trade would apply to the present case, that each individual partner constitutes the others his agents for the purpose of entering into all contracts for him within the scope of the partnership concern, and consequently that he is liable to the performance of all such contracts in the same manner as if entered into personally by himself. Again, now this advertisement is the basis of the contract between the parties ; it is upon the footing of this prospectus that the defendants had their shares allotted to them, and paid their deposits. If they are not partners under this agreement, they are not partners under any, for they neither exchanged their scrip receipts for certificates of shares, nor executed the deed when prepared, nor paid a second call when made, nor appeared at any meeting, nor interfered with any concerns of the company, nor did any act subsequent to the making this contract, nor any act before, other than applying for shares and paying the deposit of £5 per share, when they learnt from the letter of the Secretary, that a certain number of shares was appropriated to them. The paying of the deposits must undoubtedly be taken to imply an assent to the terms of the advertisement, that is an assent to become partners in a company raising a capital of £600,000 consisting of 12,000 shares and to be governed by a deed which should contain the clauses and conditions to be agreed on in future, &c.— When therefore instead of an allottment of 12,000 shares

the utmost that were allotted scarcely exceeded 7,500, when out of that number no more than 2,300 ever paid the first instalment, and only 65 subscribers signed the deed we think the subscribers were at liberty to say this was not the company upon which we paid our deposit, neither the capital nor the number of shares bearing any reasonable proportion to the original plan and project. And this more especially because by the terms of the advertisement they *were taught to expect* that the utmost risk *which they encountered, was the loss of all interest and share in the concern upon their refusal to execute the deed which loss they appear to have submitted to.*" Woodworth joint stock co., 134. Fox vs. Clifton 6 Bing. 776. 9 Bing. 120.

This case meets an objection as to the qualification attached to the instrument sued on. Woodworth in his book, above quoted speaks of the creation of Railway companies by act of Parliament and considers it indispensable, and that they are never regulated by deeds of settlement. Some times, he says, a company has been known to be carried on permanently by means of a provisional agreement only.— Refering to the forms of these agreements given by the author, we find a provision to this effect. Whereas, the several persons and parties hereto of the first part and the said A, B, C, D, &c., have associated together under the name, style or firm of ————, for the purpose of establishing (here state the object of the company), and have agreed to raise amongst themselves a capital of £————, such capital to be divided into —— shares of —— pounds each, &c., and whereas pursuant to the existing regulations of the said company, the directors have power upon giving notice to call for payment of such parts of the sums subscribed, &c., page 253.

Whether the case then be under an act of incorporation or under a deed of agreement, in all the cases that I have been able to find in the books the amount of the capi-

tal was fixed, the amount and value of the shares was also fixed, and I strongly incline to the opinion that an engagement of this kind is not valid without it—certainly an obligation of the kind we have been considering has no operation or force unless resting upon a charter or some deed having these requsites of capital and amount of shares. The shares are a part of the capital assigned to each stockholder, and a call or provision for instalments has direct reference to an instrument providing for them both.

These questions have not been much discussed with us so as to be familiar with the subject. On this account I have felt it important not so much in reference to the case before us in which it is to be regretted that a difficulty of the kind exists as to other cases that may arise in which the principles here settled may have an important influence and operation. My regret is that I have been unable to concur in the opinion and views presented by my associates.

I forbear noticing other points of objection to the pleadings and want of proof. In another respect there is a difference between us. I did not understand the attorney of defendant as waiving questions of interest to his client. He may not have insisted upon points material in the opinion of the court. This is different waiver. "When applied to the proceedings in an action, waiver may be defined to the doing something after an irregularity committed, and with a knowledge of such irregularity where the irregularity might have been corrected before the act was done, and it is essential to distinguish a proceeding which is merely irregular from one which is completely defective and void. In the latter case the proceeding is a nulity, which cannot be waived by any laches or subsequent

proceedings of the opposite party." 2 Chitty's Arch. pr. 1049.

The difficulty in this case is in the substance—in matter that may not be waived. Could the attorney by any power add $2,000 to the agreement or 24 shares of stock so as to make the agreement complete? We apprehend not, and yet without it, I submit with due deference there is not the slightest foundation for a legal judgment.