## Case No. 18,017.

### WOODWORTH v. HALL et al.

### WOODWORTH v. STONE.

[1 Woodb. & M. 389; [1] 2 Robb, Pat. Cas. 517; 6 Pa. Law J. 178; 16 Hunt, Mer. Mag. 66.]

Circuit Court, D. Massachusetts. Sept. 21, 1846.

VALIDITY OF LETTERS PATENT — SIGNATURE OF "ACTING COMMISSIONER"—CLERICAL MISTAKE—INJUNCTION.

1. Where evidence is offered to prove, that the "acting commissioner," who signs a patent, was not appointed by the president, it is questionable whether it be competent to admit it in controversies where he is not a party.

2. Under the patent law of 1836 [5 Stat. 117], the chief clerk is held to be the "acting commissioner," as well in the necessary absence of the head of the office, as in case of a vacancy de jure.

3. The sanction of the secretary of state, to a correction of a clerical mistake in letters-patent, may be given in writing afterwards; and he need not re-sign the letters themselves

4. If the correction be of only a clerical mistake, it operates back to the original date of them, unless perhaps as to third persons, who have acquired intervening rights to be affected by the alteration.

[Cited in Woodworth v. Edwards, Case No. 18,014.]

5. If a new patent, issued on a surrender of old ones, be void for any cause connected with the acts of public officers, it is questionable whether the original patents must not be considered in force till their terms expire.

[Cited in Woodworth v. Edwards, Case No. 18,014; French v. Rogers, Id. 5,103.]

6. An injunction once granted will not be dissolved on account of any doubts, as to the validity of a new patent in such cases, caused by the errors of such officers, if measures are pending in congress to remove them by legislation.

[Cited in Woodworth v. Edwards, Case No. 18,014; Woodworth v. Rogers, Id. 18,018.]

In these cases, injunctions were granted at May term, 1845, and at May term, 1846; a motion was made, in the first-named case, to dissolve the injunction. An opinion was given at the same term, stating the facts, and retaining the injunction as to one of the defendants, but dissolving it as to the other, for reasons applicable to the merits. [Case No. 18,016.]

Among the objections which were then urged against the validity of the patent, on which the claim of the plaintiff was founded, were these: Because it was signed by H. Sylvester, as acting commissioner, rather than by Edmund Burke, Esq., the commissioner; and because the patent had been altered at the patent office since it originally

1 [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]
30 Fed.Cas.—37

issued. For further particulars in relation to these objections, and the detailed facts on which they rested, reference can be had to the opinion and case, as drawn up.

At an adjourned session of the same term, held at Boston, in September, 1846, the motion to dissolve the injunction was renewed as to the first case, and the like motion made as to the second case, both of which are now to be disposed of. They were founded on the same grounds, accompanied by new evidence, offered under the first objection, to show that Mr. Sylvester, at the time of signing this patent, was not acting under any appointment made by the president, by virtue of the 8th section of the act of congress passed May 8, 1792, c. 37 [1 Stat. 281]; but, being then chief clerk in the patent office, claimed to be authorized to sign it in the necessary absence of the commissioner, under the power conferred by the 2d section of the act of July 8, 1836, c. 357 (5 Stat. 117), reorganizing the patent office.

In respect to the second objection—the alteration of the patent—it was further proved that a mistake, as to the time it was intended to run when renewed, occurred in the patent itself, as well as the record and copy of it; the proof, at the first hearing, extending only to the copy. Thus, it was issued for fourteen years, but was meant to be for twenty-eight, and was afterwards altered to twenty-eight. In answer to this, it was now shown that the secretary of state subsequently expressed in writing his assent and sanction to the correction of the mistake, though he was not consulted at the time it took place.

Mr. Giles, in support of motion.

B. R. Curtis, against it.

WOODBURY, Circuit Justice. It is not necessary to go into many of the facts and principles considered in the former motion in this subject, and then disposed of; but the new and material facts since obtained are to be examined, so far as they may weigh upon the objections, and affect the principles before settled.

The first inquiry now is, whether the chief clerk in the patent office, not having been in fact specially appointed to be acting commissioner by the president, in the absence of the commissioner himself, could legally sign this patent, under the general provision in the 2d section of the patent law of 1836 (chapter 357). The words of that section, bearing on this question, are: "The chief clerk, in all cases, during the necessary absence of the commissioner, or when the said principal office shall become vacant, shall have the charge and custody of the seal, and of the records, books, papers, machines, models, and all other things belonging to the said office, and shall perform the duties of commissioner during such vacancy."

It is contended by the defendant that this

clause empowers the chief clerk to act as commissioner only when his office is entirely, or de jure, vacant; and not when he is merely absent from sickness, or other necessary cause, constituting a de facto vacancy, only, or a want of the commissioner present to discharge the duties arising from some such cause. It is certain that the words here used, looking no farther, appear to countenance the more narrow and limited view of the word "vacancy;" but if we look to the object of the clause, to other sections of this and the succeeding patent act, to the contemporaneous construction placed upon it, to the long acquiescence under that construction, and the great public as well as private interests which have grown up in conformity to it within the last ten years, a broader meaning to the term seems fortified by the whole spirit of the act, and by the analogies of the case. It is proved as a fact, that the chief clerk, since July, 1836, has been accustomed to perform, under this section, all the duties of commissioner during his necessary absence, and without any new special authority being obtained from the president, under the law of 1792. It has been uniform in the office to consider the word "vacancy" here as meant to cover an actual, or de facto vacancy, by a necessary absence from the city; and the act has been construed so as to include as a vacancy, for this purpose and object, the inability of the commissioner at the seat of government to discharge his official duties, arising from any necessary cause, as well as a vacancy arising from his death or resignation. It is conceded, also, that many patents during that period have been signed, and many records certified, by the chief clerk, as acting commissioner, under the 2d section of the patent law, and which must become invalid if this one be so pronounced, for that cause.

It is further apparent, from the fourth section of the same law, that, unless this broad construction be correct, the chief clerk is not empowered to certify copies of the original records and papers, in the necessary absence of the commissioner, however urgent may be the necessity for them, in the protection of public or private rights. But, by a subsequent act, passed March 3, 1837, c. 45, § 2 (5 Stat. 191), the chief clerk is expressly empowered, in the absence of the commissioner, to give copies of former records supplied where formerly burned. And hence it would follow, if necessary absence in the first law is not covered by the term "vacancy," he is not authorized to give copies of original records in the absence of the commissioner, though he may of records burnt, and supplied again afterwards. This would be a distinction most groundless, and hardly presumable to have been intended. It would likewise follow, that, in the absence of the commissioner, the chief clerk was to have charge of the seal and records, but could not use them for some of the most common and necessary and urgent business connected with them. Furthermore, he is placed under oath, and also under bonds, so as to secure the community when he does act; and is, indeed, more safe for the public than a temporary commissioner selected by the president, as such a one may be under no bonds, whatever; yet, though under this security, a construction is urged that he has not been trusted by congress to act, in the very cases where a person is trusted by them to act, without security, if selected by the president. And this is the reasoning, too, though he is selected to be chief clerk, rendering him eligible to perform these duties, virtually by the president, in all cases, and often by his express wish. Nor is it any stretch of confidence, extraordinary or unnecessary, for congress to confer on a clerk such a power as the signing of a patent. It is done clearly, and is conceded to be properly done, when the commissioner dies or resigns, and a technical vacancy exists; and in case of his absence it is done, not for personal favor, but for public convenience; so that citizens are not to be delayed in getting patents till a successor is appointed, and arrives, perhaps from some remote place. So it is conceded to have been done for more than half a century, by a grant to the president from congress, by the 8th section of the act of May 8, 1792 (chapter 37). The danger from the broad construction here, is then no greater than from other powers, admitted already to exist in other ways, in relation to this same subject. But to guard against long absences, without a regular and more responsible head to a department or bureau, it is wisely provided, by the act of February 13, 1795, c. 21 [1 Stat. 415], that the temporary appointment by the president shall not continue over six months at one time, because a regular successor could in that time be procured, and the sanction of the senate should be asked for filling the office during a longer time; and by the section now under consideration it is contemplated that the temporary head of the bureau shall act only during the "absence" of the commissioner which is "necessary," or a vacancy happening in any way; both of which are, of course, not likely in any case to last longer than six months, in an age when such offices are so much sought after as in this. Again, in respect to the meaning of the word "vacancy" as used in like cases, it is obvious that the act of February 13, 1793, looked to it as covering absence and sickness, as well as death or resignation of the regular incumbent, because it speaks of a vacancy when referring to the former act, and a temporary appointment for only six months under it, and when that previous act authorized such appointment as much in case of absence and sickness as of death. All of them, then, seem to be covered by the reference, as each constituting a vacancy,

de facto, to be sure, in case of absence and sickness, but still referred to under the generic term of a "vacancy."

There is another circumstance of some importance, not yet noticed, bearing on this question. It is well known to all who have been familiar with the departments and bureaus at Washington, that the delay and inconvenience to the public in obtaining temporary appointments from the president, if absent far from the seat of government, as he sometimes is, when the head of a department or bureau, by sickness or accident, is obliged to be away from his office, has led sometimes to complaints of a suspension or postponement of business of an important character; and it has been contemplated, either by a general law, or as the department and bureaus become from time to time reorganized, to provide that the chief clerks in each should temporarily exercise the duties of the heads thereof, while they were necessarily absent. It is obvious that the public would often be much benefited by such a provision, in cases like the president's being away, so that he could not at once make a temporary appointment; and it is equally obvious that the public can never suffer by such an appointment, and by operation of law, more than it does now, when made by the president, if not away; nor would such a general provision be either novel or dangerous, considering that in the case of most ministerial offices under the government, such as collectors of the customs and marshals, their deputies, appointed by themselves, can now act for them in their absence, and do constantly perform most important duties at such times. Hence, when the land office was reorganized, 4th July, 1836, the same day the bill passed reorganizing the patent office, containing the provisions now under consideration, clauses were inserted in both bills, with a view to confer such a power or appointment on the chief clerks in both bureaus. The clause in respect to the patent office I have already quoted, and have been examining its spirit, and other analogies, in order to see if the broad one covering the present case is not the proper construction of its language and intent. The other clause, in respect to the land office, is on the same subject; but, by a different arrangement of the sentence, is too clear to admit of any different construction from that I have applied to the patent office. In the last, the language is: "And in case of a vacancy in the office of the commissioner of the general land office, or of the absence or sickness of the commissioner, the duties of said office shall devolve upon, and be performed, ad interim, by the clerk of the public lands." This clerk of the public lands was the chief clerk in the office. Undoubtedly the object to be attained was alike in both; the inconvenience to be remedied was the same; the risks similar; and it was probably only by inadvertence that less precise language was employed in the patent act than in the act as to the land office.

It is a sound rule, in the construction of statutes generally, that "every thing which is within the intent of the makers of the act, although it be not within the letter, is as much within the act as if it were within the letter and intent also." Walker v. Devereaux, 4 Paige, 252, cites 1 Plow. 366 ; Dwar. St. 691. It is conceded, however, that the intent must be ascertained by the words that are used, coupled with the mischief to be remedied. But it is a mistake to argue that because ministerial officers can do only what they are specially empowered (7 Mass. 281–283) they cannot do what, on a fair and liberal and useful construction of the words used by congress, they are specially empowered to do. The intent of an act of congress, as to such offices, is to be gathered from the whole spirit, no less than the letter of the act, as much as it is in other cases.

In both of the provisions we have just been considering, the intention of congress, seeming to have been the same, the action of the chief clerks, or heads of their respective bureaus, in their absence, is not an action without pretence of justification by any express act of congress, without countenance of any law, and a mere usurpation, as it would be, if done under an idea that they can so act, and transcend limited powers by mere construction, as being clerks, and their superiors absent; or as being more convenient, at times, to the public. But they equally rely here, and for ten years have relied, on explicit and special provisions by congress to authorize their action in both cases; both provisions being made at the same time, with a like view, though one uses language not susceptible of a different construction, while the other does not; but language which, at the same time, will fairly bear a construction in conformity with the spirit of the law, and similar to that which must confessedly be put on the other act.

Besides this reasoning and these analogies on the present question, the conclusions which I have formed in favor of the validity of these letters-patent, under this objection, are strengthened by some other considerations. Here a patent is offered in evidence, valid on its face, and objected to only on account of matter dehors, that the acting commissioner who signs it was not in fact one so acting by appointment of the president. If he had been, it is conceded, the patent is valid; and this was virtually decided by the supreme court in Wilson v. Rousseau, 4 How. [45 U. S.] 646, 663, where this very patent, signed by Mr. Sylvester as acting commissioner, was objected to, and upheld. No proof was offered there, that he had, or had not, received any such appointment; but, in such cases, it being legal to have an acting commissioner, it was presumed he was duly appointed so, and his acts

therefore valid. So, in this case, such a presumption would be enough, provided it be not competent to go further, with evidence on the subject, in a proceeding between third persons; the power of the officer himself not being here put directly in issue in a proceeding where he is a party. That a person is an acting officer is enough in most cases, even in that of murder, see the cases collected at the last session of this court, in the case of U. S. v. Peterson [Case No. 16,037]. For like reasons, probably, Justice Story, in this case, when the injunction was granted, intimated that the patent must be bad on its face, in order to sustain an objection about the officer, and Judge Kane countenances, to some extent, the same idea in his opinion in Smith v Mercer [Id. 13,078], connected with this same patent, August, 1846, Penn. D. Ct.

These reasons and opinions make it very questionable whether the evidence is competent, or admissible at all in this action, that the acting appointment of the chief clerk was not made by the president himself; and if it is not, the patent on its face, as in 4 How. [45 U. S.], must be deemed valid. I should, however, do injustice to the intrinsic difficulties of this question, and the different reasonings and analogies which have been and may be fairly brought to bear on it, were I not to add that some doubt remains in respect to the results I have reached, though the inclination of my mind is decidedly to sustain the validity of the letters.

The second objection to the patent, on account of its alteration, has been fully considered before, on some different facts, when the motion to dissolve one of the injunctions was made last spring. The correction of a mistake, though committed clerically, yet as here in a matter material, was then supposed not to be valid, though made by the commissioner, unless approved by the secretary of state. It was not thought necessary by me that the patent, after such a correction, should be re-sealed or re-signed by the commissioner, he being the officer who did both acts originally. But, as the secretary of state must by law sign it, as well as the commissioner, should the patent be altered after he signs it, he must, by analogy, be made aware of any such subsequent alteration, and sanction it, before his signature can be regarded as verifying the amended patent. No evidence was produced before of his knowledge, and his sanction of this change; but such evidence is now offered, and is probably sufficient, without any entry of the same on the letters-patent themselves. That would certainly be a convenient mode of perpetuating the evidence of his sanction; but, no law requiring it, the principles seem to demand nothing beyond his assent or ratification of it; both of which exist here in writing. Independent of form, it is in substance very seldom that he interferes at all with the issue or correction of patents;

but the commissioner practically discharges all such duties.

There is still another question connected with this point which might arise, but has not been now pressed. It is, whether a patent so amended could operate, except as from the time of the amendment; and, if not so, then those letters, being altered since the bill was filed, cannot avail the plaintiff in support of it. If new matter was inserted not originally contemplated, or corrections made not clerically, it is questionable whether they could relate back to the date of the letters-patent; but here it seems they ought to, as much as any like clerical amendments of declarations, or pleas, or judgments, under the statutes of jeofails. A different conclusion might be formed, on a fuller examination of the subject, as to third persons who had acquired rights as the patent stood before it was corrected, unless by its being in a mistaken form as to length of time, the new patent must be considered void; and the surrender of the former patents for twenty-eight years, on which it was to be founded, would be considered void, also, till a new patent in proper form issued, instead of the old ones. I merely glance, however, at these last considerations, without deciding on what has not been presented nor argued, and without going into the subject of the amendments that might then become necessary in the bill.

There has a third question been suggested, but not argued, as not being included in the notice of the motion, and will, therefore, not be examined at this time. It is, the power of the commissioner to consolidate all the terms of fourteen, seven, and seven years, into one patent for twenty-eight years. I shall merely say, that in the case of 4 How. [45 U. S.], before referred to, this patent, thus consolidated, was upheld; though it does not appear that this objection was taken and discussed by counsel or the court, though the counsel were numerous, and very astute to raise all objections appearing plausible. The point may still be found a tenable one; but, if so, a like conclusion may follow as in the other case just referred to—that if such renewal is void, the surrender of the former patents is likewise void, and recoveries can be had on them as if never attempted to be consolidated.

Finally, it is contended that if any doubt exists as to the validity of a patent, as some assuredly does here, as before stated, the injunction should be dissolved. This may, with some qualification as to other matters connected with the subject, be true in granting an injunction, as laid down in Ogle v. Edge [Case No. 10,462], if the doubt relate to the merits—that is, the originality or usefulness of a patent, or a patentee's own error in his specification. But, when the objection relates to the technical form or signature of papers connected with the letters,

and the doubts arise from acts of public officers, and not any neglect or wrong of the patentee, the position seems to me not sound. More especially should an injunction, once granted, not be disturbed for such doubts, when, as in this case, the term for trial of the merits is near; and the allowing such doubts to prevail, even to the extent of dissolving an injunction, might not merely affect the present patent and present parties, but operate injuriously on all other patents and parties where, for the last ten years, by a cotemporaneous and continued construction of the patent law, chief clerks have, under its authority, signed patents or other important papers as acting commissioner, in the necessary absence of the commissioner, or made mistakes of a clerical character in the form of the letters.

In my opinion, so far from its being proper, under such circumstances, to dissolve an injunction for doubts on such technical objections, it is rather the duty of the court if, as here, mischievous consequences are likely to ensue to others from interfering, and if, as here, legislative measures have been recommended by the public officers, which are pending, to remedy or obviate the possible evil from any public mistakes, not to dissolve an injunction already granted, unless required to do it by imperative principles of law, showing the letters-patent to be clearly void. [Grant v. Raymond] 6 Pet. [31 U. S.] 244.

* The motion in these cases, therefore, is not granted.

[For other cases involving this patent, see note to Bicknell v. Todd, Case No. 1,389.]